### The PEOPLE of the State of Colorado, Complainant,

v.

### Larry W. SCHMEISER, Respondent.

### No. 00PDJ028.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 15, 2001.

Opinion by Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board members, B. LaRAE ORULLIAN, a representative of the public, and SISTO J. MAZA, a member of the bar.

## REPORT, DECISION AND IMPOSITION OF SANCTION

*SANCTION IMPOSED: ATTORNEY SUSPENDED FOR ONE YEAR AND ONE DAY*

A sanctions hearing pursuant to C.R.C.P. 251.15(b) was held on September 18, 2001,

before the Presiding Disciplinary Judge ("PDJ") and two hearing board members, B. LaRae Orullian, a representative of the public, and Sisto J. Maza, a member of the bar. Terry Bernuth, Assistant Regulation Counsel represented the People of the State of Colorado (the "People"). Larry W. Schmeiser ("Schmeiser"), the respondent, did not appear either in person or by counsel.

The Complaint in this action was filed March 23, 2000. Schmeiser did not file an Answer to the Complaint. On May 4, 2000, the People filed a Motion for Default. Schmeiser did not respond. On June 27, 2000, the Presiding Disciplinary Judge issued an Order granting default, which established that all factual allegations set forth in the Complaint were deemed admitted pursuant to C.R.C.P. 251.15(b). The default Order also established that all violations of The Rules of Professional Conduct ("Colo.RPC") alleged in the Complaint were deemed admitted with the exception of the alleged violations of Colo. RPC 8.4(c) arising from the factual allegations set forth in the Complaint at paragraphs 64, 65, 66 and 67. *See People v. Richards,* 748 P.2d 341, 345 (Colo.1987).

At the sanctions hearing, the people presented evidence from Lesley Godley, Janice Montano, Robert Safranek and Joseph Montano. Exhibits 1 through 5 were offered by the People and admitted into evidence. The PDJ and Hearing Board considered the People's argument of counsel, the facts established by the entry of default, the exhibits admitted, and made the following findings of fact which were established by clear and convincing evidence.

## I. FINDINGS OF FACT

Schmeiser has taken and subscribed to the oath of admission, was admitted to the bar of the Supreme Court on May 25, 1983 and is registered upon the official records of this court, registration number 12922. Schmeiser is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).

All factual allegations set forth in the Complaint were deemed admitted by the entry of default. The facts set forth therein were therefore established by clear and convincing evidence. See Complaint attached hereto as Exhibit 1.

The testimony offered during the sanctions hearing supported the factual allegations established by the entry of default. In addition to the allegations in the Complaint, the testimony established that Schmeiser's clients, the personal representatives of an estate having an approximate value of $750,000, suffered additional attorney's fees, costs and other expenses as the direct result of Schmeiser's misconduct in the amount of $7,589.47.[1]

## II. CONCLUSIONS OF LAW

The entry of default in this disciplinary action established violations of Colo. RPC 1.3(neglect of a legal matter), Colo. RPC 1.4(a)(failure to keep the clients reasonably informed), Colo. RPC 1.16(d)(failure to surrender the clients' property after termination), Colo. RPC 1.5(a)(charging an unreasonable fee), Colo. RPC 8.4(c)(engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), and provided grounds for discipline pursuant to C.R.C.P. 251.5(d)(failure to cooperate and respond to requests from the Office of Attorney Regulation Counsel).

Schmeiser engaged in a long term pattern of misconduct involving neglect, failing to maintain contact with his clients, making misstatements to his clients regarding material facts, charging excessive fees for the minimal services he provided and, after termination by the clients, failing to either protect his clients' interests or return documents and property belonging to the client. As a direct result of his misconduct, there was a substantial delay in the resolution of an estate matter, tax returns were filed late, penalties were assessed by the taxing authorities, and the clients suffered financial losses

---

1. The specific dollar amount of the losses suffered by the personal representatives was determined in a default malpractice suit brought against Schmeiser by the personal representa-

tives. The amount of financial loss suffered is derived from the Order for Default Judgment in that action.

directly related to Schmeiser's misconduct of at least $7,589.47.

■ The PDJ and Hearing Board, however, cannot conclude by clear and convincing evidence that the specific factual misconduct alleged and admitted by the entry of default in paragraphs 64, 65, 66 and 67 of the Complaint, along with the other admitted facts contained in the Complaint and the evidence introduced at the sanctions hearing established additional violations of Colo. RPC 8.4(c).

Paragraph 64 in the Complaint reads:

On April 26, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients regarding his work to close the estate, to file the tax returns and obtain a federal tax identification number.

The reference in this paragraph to the events of April 26, 1998, is explained in paragraphs 32 and 33 of the Complaint. Paragraphs 32 and 33 state:

32. On April 26, 1998, Ms. Montano called the respondent at his home and asked why the work had not been done and why he had not responded to her messages. Ms. Montano was told by the respondent that the filing of the tax returns had not been accomplished and the respondent denied receiving the April 16, 1998 letter from Mr. Montano.[2]

33. During that same conversation, the respondent promised to obtain the tax identification number for the estate immediately and to finalize the work on the estate including the preparation and filing of the tax returns.

Schmeiser did not thereafter either obtain the tax identification number or finish the other tasks he promised to complete. Paragraphs 65, 66 and 67 state:

65. On July 24, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating that he would pay any penalties and interest assessed as a result of his failure to file estate tax returns on a timely basis.

66. On July 24, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating that he would do what was necessary to file the returns and close the estate.

67. On July 28, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating he would copy the file for them which he never did.

The only other facts set forth in the Complaint regarding these events are located at ¶ ¶ 41, 42 and 43.

41. At the meeting on July 24, 1998, the respondent agreed to pay any penalties and interest incurred because of his failure to file the tax returns in a timely manner.

42. At that meeting on July 24, 1998, the respondent promised to do what needed to be done to close the estate quickly.

43. At that meeting on July 24, 1998, the respondent also agreed to provide Ms. Montano with a copy of the file.

■ The factual statements contained in each of those paragraphs is a representation by Schmeiser that he will undertake certain acts in the future. When a violation of Colo. RPC 8.4(c)[3] alleging conduct involving misrepresentation is premised upon the making of a specific factual statement, the evidence must show, at least, that the factual representation in the statement was false when made.[4]

---

2. The April 16, 1998 letter from Mr. Montano to Schmeiser expressed concerns about Schmeiser's failure to do the work necessary to close the estate. It was sent via certified mail and Schmeiser signed for the letter on April 21, 1998. A violation of Colo. RPC 8.4(c) has been entered by the default arising from Schmeiser's statement that he did not receive the April 16, 1998 letter.

3. Colo. RPC 8.4(c) provides: It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

4. Although other criteria may be required to support a finding of a violation of Colo. RPC 8.4(c), falsity of the alleged misrepresentation is required.

Although cases interpreting the civil claim of misrepresentation are not necessarily controlling in a disciplinary action, the logic of those decisions are of assistance in explaining the falsity requirement. A claim for negligent misrepresentation applies only if there has been a misrepresentation of an existing fact; such claim cannot be based solely on the nonperformance of a promise to do something at a future time. *Branscum v. American Community Mut. Ins. Co.*, 984 P.2d 675, (Colo.App.1999).[A] promise relating to future events without present intent not to fulfill the promise is not actionable as negligent misrepresentation. *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 P.2d 230, 235–239 (Colo. 1995).[T]he misrepresentation must be of a material fact that presently exists or has existed in the past. *Id., citing Van Leeuwan v. Nuzzi*, 810 F.Supp. 1120, 1124 (D.Colo. 1993). There is no direct evidence, either deemed to be admitted from the Complaint or within the additional evidence introduced at trial, that established that at the time Schmeiser made those statements, they were untrue.

Although a reasonable inference may be drawn from the facts set forth in the Complaint paragraphs set forth above that Schmeiser did not intend to perform the referenced acts at the time he made the statements, in light of his other misconduct, it is also a reasonable inference that he had the intent to do the acts at the time he made the statements and, as with his pattern of misconduct, neglected to do so. The PDJ and Hearing Board cannot conclude that the inference suggesting a violation of Colo. RPC 8.4(c) is of sufficiently greater likelihood than the inference that may be drawn that there was no violation. Accordingly, the PDJ and Hearing Board find that the alleged violations of Colo. RPC 8.4(c) arising from the facts set forth in paragraphs 64, 65, 66 and 67 in claim one of the Complaint were not established by a clear and convincing standard and are therefore dismissed.

**5.** The People argued that the injury suffered by the clients was "serious" and, therefore, the disbarment provisions of ABA *Standards* 4.41 applied to Schmeiser's misconduct. The PDJ and

## III. SANCTION/IMPOSITION OF DISCIPLINE

The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") is the guiding authority for selecting the appropriate sanction to impose for lawyer misconduct.

In disciplinary cases involving neglect, ABA *Standards* 4.42(a) and (b) recommend that suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

Schmeiser's pattern of misconduct in this single matter with regard to the violations upon which default entered was knowing misconduct and extended over a significant period of time. On repeated occasions, Schmeiser allowed critical deadlines to pass without performing the required services, failed to communicate with his clients, deceived his clients into believing that the necessary services would be provided timely and, when terminated by the clients, failed to protect their interests or return necessary documents and property. As a result of Schmeiser's misconduct, his clients were forced to endure an unreasonable delay in the resolution of an estate and tax matter, were exposed to interest and penalties from taxing authorities, were required to secure the services of replacement counsel with the attendant increase in attorney's fees and were forced to recreate the necessary documentation to conclude the estate and tax matters. The clients suffered injury as a result of Schmeiser's misconduct.[5] Schmeiser's misconduct involving neglect meets the requirements of ABA *Standard* 4.42.

With regard to deceit and misrepresentation, ABA *Standard* 4.62 provides:

Hearing Board did not conclude that the injury was "serious" as envisioned by the ABA *Standards*.

Suspension is generally appropriate when a lawyer negligently fails to provide a client with accurate and complete information, and causes injury or potential injury to the client.

As with the neglect provisions of the ABA *Standards,* Schmeiser's misconduct falls within the type of misconduct for which suspension is recommended. Colorado law also suggests a period of suspension is the appropriate sanction in this case. *People v. Rishel,* 956 P.2d 542, 544 (Colo.1998)(one year and one day suspension with payment of restitution was warranted for neglecting legal matter entrusted to lawyer in one matter, and in two matters, failing to keep client reasonably informed about the status of a matter, failing to promptly refund client funds upon request, and failing to take reasonable steps to protect the clients' interest upon termination of representation); *People v. Boyle,* 942 P.2d 1199, 1204 (Colo.1997)(attorney suspended for two years pursuant to a conditional admission of misconduct for mishandling legal matters, charging an unreasonable fee, and willful misrepresentation arising from conviction for aiding and abetting an alien in obtaining entry into United States); *People v. Price,* 929 P.2d 1316, 1320 (Colo.1996)(attorney suspended for one year and one day for, among other violations, serious neglect of multiple client matters, failure to communicate with clients and failing to hold client property separate); *People v. Berkley,* 914 P.2d 338, 342 (Colo.1996)(attorney suspended for one year and one day with order of restitution pursuant to a conditional admission of misconduct arising from two disciplinary matters for the attorney's neglect of legal matters of five separate clients, and his failure to keep clients reasonably informed).

## IV. ORDER

Accordingly, the PDJ and Hearing Board herein Order:

1. Larry W. Schmeiser is suspended for one year and one day effective thirty-one days from the date of this Order;

2. Respondent shall pay to Leslie Godley and Janice Montano the amount of $7,587.47 in restitution and $10,181.25 in fees prior to reinstatement to the practice of law;

3. Respondent shall pay the costs of this proceeding. Counsel for complainant shall file a Statement of Costs within fifteen days of the date of this Order. Respondent may file a response thereto within five days of receipt of the Statement of Costs.

## EXHIBIT 1

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

45. The respondent has taken and subscribed to the oath of admission, was admitted to the bar of this court on May 25, 1983, and is registered upon the official records of this court, registration No. 12922. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered home address is 21050 County Road 197, Limon, Colorado 80828.

### GENERAL ALLEGATIONS

46. Janice Montano ("Ms.Montano") and her cousin, Leslie Godley ("Mr.Godley"), the complaining witnesses herein, were named as co-personal representatives in the First Codicil of the Last Will of Lena Godley Phleeger. Ms. Phleeger died on May 14, 1996.

47. Shortly thereafter, Ms. Montano and Mr. Godley, who were not beneficiaries of Ms. Phleeger's will, hired the respondent to handle all issues associated with informal probate of the estate.

48. The respondent was retained because he had drafted the decedent's will and the first codicil thereto. Ms. Montano and Mr. Godley believed, based on the respondent's conduct, that he was an experienced attorney in probate and estate matters. The respondent had been Ms. Phleeger's attorney for several years prior to her death.

49. The respondent prepared and filed two simple documents necessary to open the probate of the estate, the form "application for informal probate of will and informal appointment of personal representatives" and the form "letters" for the clerk's signature.

50. Letters of appointment issued on June 26, 1996, designating Ms. Montano and Mr. Godley co-personal representative.

51. The respondent was specifically retained by the co-personal representatives for acquisition of the tax identification number and preparation of and filing of state and federal estate tax returns.

52. The decedent's personal tax preparer, Errol Hertnecky, was also hired by Ms. Montano and Mr. Godley to do the preparation and filing of Ms. Phleeger's last income tax return (Form 1040) and the estate's income tax return (Form 1041).

53. Mr. Hertnecky prepared the income tax returns for tax year 1996 but the Form 1041 was not timely filed due to respondent's failure to obtain the tax identification number.

54. The Form 1041 tax return was due April 15, 1997. The respondent promised Hertnecky and Ms. Montano and Mr. Godley that he would obtain the tax identification number from the Internal Revenue Service but he failed to do so.

55. The assets of the estate consisted primarily of stocks, bonds, cash, one small vacant lot which was easily sold by a real estate broker, and some minimal personal property.

56. By the end of November, 1996, Ms. Montano and Mr. Godley had determined the assets and outstanding debts of the estate and had provided that information to the respondent.

57. The respondent therefore had the information necessary to prepare and file the state and federal estate tax returns (Form 706) and to move forward with the closing of the estate by the end of November, 1996.

58. Between the latter part of 1996 and May 1997, Ms. Montano and Mr. Godley did not hear from the respondent despite their numerous calls to him and messages requesting a return phone call left on his office telephone recorder.

59. Ms. Montano was finally able to make arrangements to meet with the respondent on May 26, 1997 to discuss the status of the estate.

60. At the May 26, 1997 meeting, the respondent assured Ms. Montano and Mr. Godley that he would quickly do everything necessary including the preparation and filing of the federal and state estate tax returns, so that the estate could be closed.

61. At the May 26, 1997 meeting, at the respondent's request, Ms. Montano and Mr. Godley paid the respondent $10,181.25, which was full payment for attorney's fees and estimated costs of $181.25 to accomplish all necessary tasks and close the estate.

62. At the May 26, 1997 meeting at the respondent's request, Ms. Montano and Mr. Godley gave the respondent two blank checks, one payable to the IRS, and the other payable to the Colorado Department of Revenue, so that he could pay the federal and state estate taxes upon filing of the returns.

63. The respondent was directed by Ms. Montano and Mr. Godley to fill in the appropriate amounts on the checks when the tax returns were ready to be filed, so that those checks could accompany the return.

64. Upon information and belief, at the meeting with Ms. Montano and Mr. Godley on May 26, 1997, the respondent knew that he had already missed the filing deadline for the estate tax returns but he did not disclose that information to Ms. Montano or Mr. Godley.

65. All attorneys who practice estate work know that the estate tax returns must be filed no later than nine months after the date of death.

66. Ms. Montano and Mr. Godley later had to stop payment on the checks provided to the respondent because he never prepared nor filed the estate tax returns and he failed to return the checks after being asked to do so.

67. Following the May 26, 1997 meeting, Ms. Montano and Mr. Godley placed numerous telephone calls to the respondent and left numerous telephone messages on his answering machine requesting return calls.

68. Subsequent to May 26, 1997 through December 1997, Ms. Montano and Mr. Godley placed a total of 31 telephone calls to the

respondent, 28 calls were made to his office and 3 were made to his home.

69. Over the course of these 31 telephone calls, Ms. Montano and Mr. Godley were able to talk to the respondent on seven occasions.

70. In those telephone conversations, the respondent repeatedly promised that he would quickly do everything necessary to close the estate including acquisition of the tax identification number and preparation and filing of the estate tax returns.

71. In one of the telephone conversations, in June 1997, the respondent advised Ms. Montano that the only outstanding claim against the estate to the nursing home was a claim that required further investigation and that he would resolve the disputed claim.

72. Between January 1, 1998 and April 23, 1998 both Ms. Montano and Mr. Godley made numerous telephone calls to the respondent's home and/or office. Rarely were they able to talk to him but each time they did he promised to get the tax identification number and to prepare the tax returns so the estate could be closed. When they were unable to talk to him, they each left messages requesting return telephone calls. The respondent did not return their calls.

73. On March 9, 1998, Ms. Montano sent the respondent, at his request, a check to pay the nursing home bill. The respondent failed to pay the nursing home bill and never returned the check to Ms. Montano or Mr. Godley, even though he was requested to do so.

74. Sometime in the Spring of 1998, Mr. Godley was finally able to reach respondent by telephone after many attempts and many messages that the respondent did not respond to, and scheduled an appointment with the respondent. When Mr. Godley appeared for the scheduled appointment, the respondent did not appear.

75. Ms. Montano and Mr. Godley spoke with Ms. Montano's husband who is an attorney about the situation and their lack of contact with the respondent. At the co-personal representatives' request, Mr. Montano began attempting contact with the respondent on their behalf. On April 16, 1998, Joseph Montano, writing on behalf of the co-personal representatives, expressed concerns about the respondent's failure to do the work necessary to close the estate. That letter was sent certified mail, return receipt requested. The respondent signed for the letter on April 21, 1998, but failed to respond to it.

76. On April 26, 1998, Ms. Montano called the respondent at his home and asked why the work had not been done and why he had not responded to her messages. Ms. Montano was told by the respondent that the filing of the tax returns had not been accomplished and the respondent denied receiving the April 16, 1998 letter from Mr. Montano.

77. During that same conversation, the respondent promised to obtain the tax identification number for the estate immediately and to finalize the work on the estate including the preparation and filing of the tax returns.

78. On April 30, 1998, Mr. Montano, again on behalf of the co-personal representatives, wrote the respondent and sent him another copy of his April 16, 1998 letter as well as a copy of the receipt bearing the respondent's signature. The respondent did not respond to the April 30, 1998 letter from Mr. Montano.

79. After the conversation Ms. Montano had with the respondent on April 26, 1998, she left numerous telephone messages for him on his telephone answering machine but her calls were not returned.

80. The co-personal representatives and the beneficiaries of the estate in conjunction with Mr. Montano left messages but did not receive return calls from the respondent.

81. Between April 26, 1998, and June 4, 1998, on the two occasions when Mr. Montano, acting on behalf of the co-personal representatives, was able to speak with the respondent, the respondent promised he would quickly complete the work necessary to close the estate. At that point, the only task remaining to close the estate was to pay the one outstanding debt of the estate to the nursing home and to accomplish the filing of the estate tax returns.

82. On June 4, 1998, Mr. Montano, acting on behalf of the co-personal representatives, again wrote the respondent a letter and asked when the estate would be closed.

83. Ms. Montano continued to call the respondent and was finally able to schedule a meeting with the respondent on July 20, 1998. When Ms. Montano and Mr. Godley arrived for that scheduled meeting, the respondent was not in the office and no meeting was held.

84. Ms. Montano again telephoned the respondent and was able to schedule a meeting. Ms. Montano and Mr. Godley were able to meet with the respondent on July 24, 1998. During that meeting, Ms. Montano and Mr. Godley confronted the respondent about the missed deadlines for the filing of the tax returns.

85. At that meeting on July 24, 1998, the respondent agreed to pay any penalties and interest incurred because of his failure to file the tax returns in a timely manner.

86. At that meeting on July 24, 1998, the respondent also promised to do what needed to be done to close the estate quickly.

87. At that meeting on July 24, 1998, the respondent also agreed to provide Ms. Montano with a copy of the file.

88. None of the things that the respondent promised at the July 24, 1998 meeting were done by him. During the next month from July 24 to August 24, 1998, Ms. Montano and Mr. Godley heard nothing from the respondent though they initiated calls to him and left messages requesting return calls.

89. Mr. Montano, on behalf of the co-personal representatives, also tried to contact the respondent repeatedly between July 24 and August 24, 1998. Mr. Montano did get in touch with the respondent on August 24, 1998, at which time the respondent again promised to do what was necessary to close the estate. Mr. Montano memorialized that telephone conversation and that promise with a letter dated August 25, 1998, to the respondent. The respondent did not respond to the letter and did not return the calls from Ms.

Montano or her husband subsequent to the telephone conversation of August 24, 1998.

90. Ms. Montano and Mr. Godley sent a letter dated September 15, 1998, to the respondent firing him and requesting that he provide the file to the successor counsel, Robert Safranek. The respondent never did deliver the file to Mr. Safranek.

91. On October 1, 1998, Mr. Safranek advised the co-personal representatives through Mr. Montano that the respondent had failed to deliver the file. On that same day, Mr. Montano, on behalf of the co-personal representatives, again wrote to the respondent again requesting that the file be turned over to Mr. Safranek. The file was never provided to Mr. Safranek, and the respondent refused to release any part of the file to Mr. Safranek's secretary when she went to his office and offered to copy it.

92. Mr. Safranek took immediate steps to prepare and file an inventory with the probate court and to prepare and file the federal and state estate tax returns. With each return, payments were made to cover the tax and estimated interest for late filing.

93. On December 21, 1998, the IRS issued a notice that the estate owed $4,387.08 in penalties and $2,631.86 in interest as a result of the late filing. The State of Colorado assessed $2,537.60 in interest for late filing and a penalty for late filing of $4,327.10.

94. Mr. Safranek spent much attorney time in his efforts to convince the IRS and the State of Colorado to waive the interest and penalties. The estate incurred additional attorney's fees as a result.

95. Ultimately, Mr. Safranek was successful in persuading the state and the IRS to waive the penalties but not the interest.

96. On January 27, 1999, Ms. Montano and Mr. Godley and the estate of Lena Godley Phleeger filed a malpractice suit against the respondent. The respondent defaulted in that proceeding.

97. By order dated July 30, 1999, a judgment in the amount of $48,001.65 was entered in favor of the co-personal repre-

sentatives and the estate and against the respondent.

98. By letter dated November 27, 1998, the respondent was provided with a copy of the complaining witnesses' request for investigation and he was asked to respond to the Office of Disciplinary Counsel. The respondent did not respond.

99. On February 24, 1999, Irene Siegenthaler, a secretary in the Office of Attorney Regulation Counsel (fka Disciplinary Counsel) called operator assistance and obtained a telephone number for the respondent. When she called that number and spoke to the respondent, the respondent denied receiving the November 27, 1998 letter. The respondent gave her a new address.

100. Additional copies of Ms. Montano's and Mr. Godley's request for investigation and the request for a response was sent by certified and first-class mail on February 24, 1999. The return receipt for the certified mail was signed by Estel Schmeiser on February 25, 1999. Estel Schmeiser is the respondent's father living at the same address. No response was ever received from the respondent by the Office of Attorney Regulation Counsel or Office of Disciplinary Counsel.

101. By letter dated April 19, 1999, the respondent was again asked by the Office of Attorney Regulation to respond to the request for investigation filed by Ms. Montano and Mr. Godley. The respondent did not respond. The respondent has not cooperated with the Office of Attorney Regulation Counsel in its investigation after having been given notice.

### CLAIM I

#### [Colo. RPC 8.4(c) (dishonesty, fraud, deceit and misrepresentation) ]

58. Paragraphs 1 through 57 are incorporated herein.

59. The respondent knowingly and intentionally engaged in misrepresentation and deceived clients on May 26, 1997 by stating that he would accomplish everything necessary for preparation and filing of federal and state estate tax returns.

60. At the time the respondent made that statement, he knew it was false.

61. The respondent knowingly and intentionally engaged in misrepresentation and deceived clients by not advising them on May 26, 1997, that the estate tax filing deadlines had been missed.

62. Upon information and belief, the respondent knew the filing deadline for estate tax returns is nine months after date of death.

63. The respondent knowingly and intentionally engaged in misrepresentation and deceived his clients regarding receipt of the April 16, 1998 letter from Mr. Montano and the action he would take to prepare and file tax returns.

64. On April 26, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients regarding his work to close the estate, to file the tax returns and obtain a federal tax identification number.

65. On July 24, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating that he would pay any penalties and interest assessed as a result of his failure to file the estate tax returns on a timely basis.

66. On July 24, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating that he would do what was necessary to file the returns and close the estate.

67. On July 28, 1998, the respondent knowingly and intentionally engaged in misrepresentation and deceived clients by stating he would copy the file for them which he never did.

68. Each of the above-referenced incidents are distinct violations of Colo. RPC 8.4(c) on the part of the respondent.

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM II

### [Colo. RPC 1.3 (neglect resulting in abandonment) ]

69. Paragraphs 1 through 68 are incorporated herein.

70. The respondent knowingly and intentionally neglected legal matters that were entrusted to him by his clients including the filing deadline for tax returns, obtaining a tax identification number, preparation and filing of tax returns and doing the tasks necessary to close the estate.

71. The respondent's neglect of the legal matter coupled with his failure to communicate results in abandonment of the client.

72. The respondent's conduct violated Colo. RPC 1.3.

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM III

### [Colo. RPC 1.4(a) (failure to communicate resulting in abandonment) ]

73. Paragraphs 1 through 72 are incorporated herein.

74. The respondent failed to communicate with his clients from December 1996 through May 1, 1997, even though numerous telephone calls and requests for return calls were left on his telephone recorder.

75. The respondent failed to keep an appointment with Mr. Godley in Spring 1998.

76. The respondent scheduled an appointment on July 20, 1998, but failed to appear, cancel or reschedule.

77. The respondent failed to respond to letters sent to him by Mr. Montano on behalf of the clients on April 16, 1998, and April 30, 1998.

78. The respondent failed to return telephone messages that were left on his answering machine on June 2, 1998; July 27, 1998; July 30, 1998; August 13, 1998; August 21, 1998; August 25, 1998; and October 26, 1998. Those telephone messages were left by Mr. Montano who was acting on behalf of the co-personal representatives.

79. The respondent's failure to communicate coupled with his neglect of the legal matter resulted in abandonment of the client.

80. The respondent's conduct referenced above are distinct violations of Colo. RPC 1.4(a).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM IV

### [Colo. RPC 1.16(d) (improper retention of file, advance fees and other property upon termination)]

81. Paragraphs 1 through 80 are incorporated herein.

82. The respondent failed to return clients' checks that were made out to the IRS, the State of Colorado, and IHS Cheyenne Mountain Nursing Home though he had been requested to do so.

83. By letter dated September 15, 1998, the respondent was fired and instructed by clients to turn over the file to Mr. Safranek which he never did.

84. The respondent did not allow Safranek's secretary to copy the file.

85. Upon termination, the respondent had a duty to protect his clients' interests and surrender papers and property to clients.

86. The respondent's conduct violated Colo. RPC 1.16(d) for each of the above instances of failure to surrender clients' property.

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM VI

### [Colo. RPC 1.5(a) (unreasonable fee) ]

87. Paragraphs 1 through 86 are incorporated herein.

88. The respondent requested attorney's fees in advance of his work. The respondent was paid $10,000 plus costs.

89. Ten thousand dollars for the services performed is an unreasonable fee. The only work respondent accomplished on behalf of the estate was to file two simple form documents.

90. Mr. Safranek, who has practiced law for 35 years, filed an affidavit in the malpractice action brought against the respondent wherein he swore that the beneficial work done by the respondent could have been accomplished in approximately five hours and that work would command a fee of about $500.

91. Based on Mr. Safranek's expert opinion, the respondent is entitled to only $500 for the work he did for clients.

92. The respondent never returned any of the advance fee paid to him by clients.

93. The respondent's conduct violated Colo. RPC 1.5(a).

WHEREFORE, the complainant prays at the conclusion hereof.

### CLAIM V

**[C.R.C.P. 251.5(d) previously known as C.R.C.P. 241.6 (failure to respond) ]**

94. Paragraphs 1 through 93 are incorporated herein.

95. The respondent failed to cooperate and to respond to requests from either the Disciplinary Counsel or the Office of Attorney Regulation Counsel.

96. The respondent's foregoing conduct violated C.R.C.P. 251.5(d) and C.R.C.P. 241.6.

WHEREFORE, it is prayed that the respondent be found guilty of violations of the above referenced rules of conduct which establish grounds for discipline as provided in C.R.C.P. 251.5 and C.R.C.P. 241.6, and the Colorado Rules of Professional Conduct and that he be appropriately disciplined and assessed the costs of these proceedings.

TERRY BERNUTH, # 13146
Assistant Regulation Counsel
JOHN S. GLEASON, # 15011
Regulation Counsel

600 17th Street, Suite 200–South
Denver, Colorado 80202
Telephone: (303) 893–8121
Attorneys for Complainant